[No. B230346. Second Dist., Div. Seven. July 24, 2012.]

ENRIQUE HERRERA CHAVEZ et al., Plaintiffs and Appellants, v. GLOCK, INC., et al., Defendants and Respondents.

COUNSEL

Law Offices of Ian Herzog, Ian Herzog, Evan D. Marshall and Justin Ehrlich for Plaintiffs and Appellants.

Tucker, Ellis & West, Curtiss L. Isler, Bart L. Kessel, Rebecca A. Lefler; Renzulli Law Firm, John F. Renzulli and Christopher Renzulli for Defendants and Respondents Glock, Inc., and Los Angeles Police Revolver and Athletic Club.

Bacalski, Ottoson & Dube, The Eclipse Group, Gary C. Ottoson and Denise M. Serino for Defendant and Respondent Bushnell, Inc.

Schaffer, Lax, McNaughton & Chen and Richard P. Dieffenbach for Defendant and Respondent Andrews Sporting Goods, Inc.

## OPINION

**PERLUSS, P. J.**—Los Angeles Police Officer Enrique Herrera Chavez was shot in the back with his service weapon, a Glock 21, by his three-year-old son, rendering him a paraplegic. Chavez and his wife, Leonora Aduna Chavez, sued the manufacturers and retailers of his gun and its holster for strict product liability and related torts, alleging the Glock 21 is defective because it has a light trigger pull without an appropriate safety mechanism to prevent accidental discharge and the holster fails to sufficiently protect the trigger or properly secure the gun. The trial court granted the motions for summary judgment filed by each defendant. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Shooting Incident*

Chavez joined the Los Angeles Police Department (Department) in 1996. According to Chavez, he was taught at the police academy an officer should carry a firearm in a ready-to-fire condition both on and off duty. Chavez was particularly influenced by the story of an officer who was shot in her driveway after an assailant had followed her home from the police station.

Chavez was also taught about firearm safety, including the proper way to store firearms at home. For example, the Department's firearms training manual states, "Home Firearms Safety. Many officers maintain personally owned weapons at home for sport or protection purposes. To preclude accidents with firearms at home from occurring with any firearm[] which is not under the direct control of an officer, the following precautions must be practiced in addition to the general and specific firearm safety rules. [¶] Separate the ammunition from the weapon. [¶] Store the weapon and ammunition separately out of the reach of children. [¶] . . . [¶] If no secure container is available, utilize a trigger lock or disassemble the firearm."

After completing his training at the police academy, Chavez was issued a Beretta 92F pistol. In 2000 Chavez was assigned to the Newton Division in South Central Los Angeles. About that time Chavez began leaving the holstered Beretta in his truck overnight after he had arrived home and satisfied himself the area was safe. By doing so, the handgun was available for use if Chavez needed it while getting into his truck in the morning and driving to work.

In September 2003 Chavez purchased a Glock 21, which the Department had recently approved as a replacement for the Berretta, from the Los Angeles Police Revolver and Athletic Club (Revolver Club). Subsequently, Chavez purchased from Turner's Outdoorsman an "Uncle Mike's Sidekick Ambidextrous Hip Holster" manufactured by Bushnell, Inc. The package stated the holster was designed for use with Glock pistols.

Chavez began carrying the Glock 21 as his service weapon after passing a training course. As he had with the Beretta, Chavez carried the Glock in the holster on his Sam Browne utility belt while on duty and then placed it in the Uncle Mike's hip holster when off duty, leaving it under the driver's seat or console area of his truck after arriving home.

In early 2006 the Department recalled the Glock 21 pistols and ordered them tested and, if necessary, repaired before being used on duty. While Chavez's Glock was at the armory for testing, he again used his Beretta as his service weapon.

By end of shift at 6:00 a.m. on July 10, 2006, Chavez had received his Glock back from the armory and made all the adjustments necessary to begin carrying it again. After he left the station, he placed the loaded Beretta with the manual safety decocking lever disengaged on the floorboard underneath the front seat of his truck (a Ford Ranger) and the loaded Glock, which does not have a manual safety device, underneath his leg.[1] He also placed a bag, with multiple rounds of ammunition—both for the Beretta and a shotgun—in the back of the truck. When he arrived home, Chavez moved the Glock to a position underneath the center console and left the ammunition and the Beretta where they were because his wife and child were in the house and he "didn't want to deal with it"; he was also tired because he had not slept in two days.

Chavez's dog died shortly after he returned home. In order to transport the dog to the pet cemetery, Chavez had to remove the child car seat from the front passenger seat of his truck; he placed it in his wife's car. When he returned home, he went to sleep, leaving the guns and ammunition in the truck.

Shortly after Chavez awoke the following day, he was notified he had to go to court to testify. Chavez had previously arranged with his parents to provide childcare when both he and his wife were at work, so he called his father to arrange to drop off three-year-old Collin. When he went to his truck with Collin, however, Chavez realized he had removed the car seat. He called his wife, who told him the car seat was still in her car. Chavez then concluded the safest place for Collin to ride was the rear passenger fold-down jump seat because the airbags in front could not be deactivated. Although Chavez saw the handle of the Beretta on the floor below the driver's seat where he had left it, he forgot the Glock was also in the truck. Chavez believed the Beretta was beyond Collin's sight line and grasp. Chavez fastened Collin into the jump seat with the seatbelt.

Less than 10 minutes later, Collin picked up the Glock and discharged a round into Chavez's back as they were stopped at a red light. According to Chavez, after the force of the shot slammed him against the window, he reached in back to grab Collin but could not reach him. He then reached for the gun, grabbing it and the holster together. As he picked up the holster and gun and held them upside down, the gun slid out of the holster.

The gunshot rendered Chavez a paraplegic. The Department brought a complaint against Chavez for failure to control his firearm, which was

---

[1] Chavez acknowledged the Glock 21 has a lock for use when stored. Although he received a lock when he purchased the firearm and used it on at least one occasion, by the time of the lawsuit he did not know where it was.

sustained. The Orange County District Attorney, however, elected not to prosecute Chavez for child endangerment pursuant to Penal Code section 273a.

In July 2008 Chavez and his wife filed their complaint and on January 8, 2009, a first amended complaint for strict product liability, negligence, breach of implied warranty and loss of consortium. Named as defendants were Glock, Inc., Revolver Club, Bushnell[2] and Andrews Sporting Goods, Inc., doing business as Turner's Outdoorsman (Turner's). The amended complaint alleged, in essence, the Glock 21 is defective as to both design and warnings because it has a light trigger pull (5.5 pounds) yet lacks a safety mechanism to prevent accidental, unknowing or inadvertent discharge. With respect to the holster, the amended complaint alleged it is defective either because the trigger is not sufficiently protected and thus the gun can be fired while in the holster or the holster fails to properly secure the gun so a three year old cannot remove it.[3]

 2. *The Motions for Summary Judgment or, Alternatively, Summary Adjudication*

 a. *Glock and Revolver Club's motion*

 i. *Design defect*

Glock and Revolver Club jointly moved for summary judgment or, alternatively, summary adjudication, contending Chavez could not establish any of the three alleged defects in the Glock 21's design caused his injuries. First, they argued Chavez could not prove a heavier trigger pull would have prevented the accident because he is not able to establish the amount of force Collin exerted on the trigger when he discharged the pistol. Next, they asserted Chavez could not prove a grip safety would have prevented the accident because there is no evidence where Collin's hands were positioned or how he was handling the pistol at the time of discharge. Finally, they asserted a manual safety would not have prevented the accident because Chavez admitted he always stored and carried his Beretta with the manual safety decocking lever disengaged and thus the only reasonable inference is that he would not have engaged a manual safety on the Glock 21 if there had been one. Glock and Revolver Club further argued Chavez's reckless conduct, including leaving loaded guns in his truck and failing to secure Collin in a proper car seat, was the sole cause of his injury.

---

[2] Bushnell was erroneously sued as Bushnell Outdoor Products and Uncle Mike's.

[3] The complaint also alleged strict product liability under a manufacturing defect theory. Chavez has not pursued that theory.

In addition to asserting lack of causation, Glock and Revolver Club contended Chavez could not establish a design defect under either the consumer expectation or risk-benefit test as a matter of law. They argued, as a sophisticated user, Chavez knew it was dangerous to store a loaded firearm where his children could reach it, knew children are attracted to and can operate guns and admitted he did not expect manual safeties would make a firearm childproof. They also argued the Glock 21's trigger pull and lack of a manual safety device make it a superior weapon for law enforcement because of the ease and accuracy with which it can be fired.

In support of their motion Glock and Revolver Club submitted the declaration of Emanuel Kapelsohn, a law enforcement firearms instructor and training consultant. According to Kapelsohn, "[T]he handgun designed for law enforcement use must, within reasonable limits, be as easy for the user to operate under stress as possible, with the least chance possible for any user error that would prevent the handgun from being used effectively for its intended purpose. Among other things, the clear preference of U.S. law enforcement for at least the past twenty years has been for handguns with more manageable trigger pulls (such as the Glock), and for designs (such as the Glock) without manual safeties." Kapelsohn explained he had "repeatedly seen users of firearms with manual safeties and/or decocking lever[s] . . . try to fire but find themselves unable to do so, because they have not disengaged the safety, or have re-engaged it inadvertently"[4] and "[i]nstances in which a safety on a duty weapon has resulted in an officer being injured or killed have not only occurred, but have been widely publicized in the law enforcement literature . . . ." Consequently, the Department had trained its officers to carry their Beretta pistols with the safeties off. Regarding grip safeties, Kapelsohn described them as "problematic, especially in the stressful defense use, or simulated defensive use." He testified their use by law enforcement agencies was quite limited and "has not enjoyed anything approaching the popularity and widespread law enforcement agency use of [various models], which do not use grip safeties."

Regarding the trigger pull, Glock offers several options to law enforcement agencies.[5] Kapelsohn explained the 5.5-pound connector required by the Department, which produces a trigger pull in the range of 5.5 to seven pounds, increases the accuracy and speed with which the pistol can be fired: "While a certain weight of pull and a certain length of trigger travel are

---

[4] Chavez, himself, had difficulty during training exercises remembering to disengage his Beretta's manual safety (a decocking lever).

[5] In addition to the trigger pull option chosen by the Department, Glock offered law enforcement agencies "a heavier pull (about 8.0 to 10.0 pounds), and two 'springier' feeling pulls ranging from about 8.5 to as much as 11 pounds." Kapelsohn asserted, "[T]he heaviest of these pulls is the least popular among law enforcement agencies, with very few of them cho[o]sing it."

necessary for the trigger to be controllable by the officer in stressful situations, making the trigger pull excessively long or heavy is detrimental both to accuracy, and to the speed with which the officer can fire the pistol safely and effectively. The accuracy/speed balance translates, in turn, into both officer safety (in the officer's ability to defend himself) and the safety of others (in the officer's ability to defend them from impending attack). Accuracy also means the officer will miss fewer shots, each of which potentially endangers fellow officers and the public." Kapelsohn measured the trigger pull of Chavez's Glock 21, finding it above 6.5 pounds and below 6.75 pounds—a trigger pull he described as "not an excessively light trigger, and . . . in the same approximate weight range as many of the other most popular brands and models of law enforcement pistols on the market."

Glock and Revolver Club also submitted the declaration of retired Sergeant Louis Salseda, who had been the sergeant in charge of Chavez's firearms training when he was in the police academy. Salseda corroborated many of the points made by Kapelsohn. Additionally, he stated the Department's special investigative section had selected the Glock 21 after extensive testing and evaluation over a four-year period because of the "simplistic operation . . . under high stress, loss of fine motor skills operations." Other Department divisions subsequently evaluated and approved Glock pistols for use.

### ii. *Failure to warn and breach of implied warranty*

Glock and Revolver Club contended manufacturers have no duty to warn consumers about generally known or obvious dangers. Chavez admitted he understood the warnings and instructions on safe firearm storage set forth in the instruction manual that accompanied the Glock 21.[6] In addition, the risks posed by storing loaded firearms where children can reach them are obvious and were well known to Chavez because of his training.

As to Chavez's implied warranty cause of action, Glock and Revolver Club argued Chavez could not establish vertical privity: Based on an examination of serial numbers, it was determined the handgun fired by Collin had been purchased by Chavez's partner. Somehow Chavez and his partner had inadvertently switched weapons.

---

[6] For example, the manual states, "The use of a locking device or safety lock is only one aspect of responsible firearm storage. Firearms should be stored unloaded and locked in a location that is both separate from their ammunition and inaccessible to children and other unauthorized persons." It also states, "Keep firearms and ammunition out of the reach of children."

### iii. *Immunity*

In a final brief paragraph, Glock and Revolver Club contended Chavez's claims were barred by the Protection of Lawful Commerce in Arms Act, title 15 United States Code sections 7901 to 7903 (PLCAA or Act), which generally provides immunity to firearms manufacturers and dealers from lawsuits falling within the Act's definition of a "qualified civil liability action" unless the lawsuit falls within one of six exceptions, including for product liability actions, to that definition. (*Id.*, §§ 7902, 7903.) Presuming without argument Chavez's lawsuit is a qualified civil liability action, Glock and Revolver Club argued the exception for product liability actions did not apply because the firearm discharge was caused by Chavez placing Collin in the car without a child seat where he could reach the pistol, conduct that constituted volitional criminal acts in violation of Penal Code former section 12035 (now Pen. Code, § 25100) (unlawful storage of a firearm) and Vehicle Code section 27360 (failure to properly secure child in car seat).

### b. *Bushnell's motion*

### i. *Design defect*

Bushnell moved for summary judgment or summary adjudication, contending Chavez could not establish any defect in the holster caused his injury because it was not in use at the time of the accident. In support of its argument, Bushnell submitted a declaration from Lance Martini, a forensic scientist with expertise in the areas of firearm evidence, gunshot residue, firearm failure analysis and other firearm-related subjects. Based on his examination and testing of Chavez's holster, as well as an exemplar holster of the same make and model and an exemplar Glock 21, Martini opined Chavez's pistol had been fully removed from the holster when it was fired because of the lack of any gunshot residue on the holster and any evidence the holster had been cleaned. Martini also concluded the gun could not have been in a fully seated position in the holster with the retention strap secured when it was fired because the holster would not have allowed sufficient movement of the slide to partially eject the expended cartridge casing, which was found "stove-piped"—that is, jammed in the ejection port. According to Martini, "If the Glock pistol would have discharged with the holster strap secured, the pistol would have been found in the holster, with the strap secured, and the slide fully forward (in battery) and the expended cartridge case fully contained within the chamber."

Bushnell also asserted the holster was not defectively designed under the consumer expectation test because no reasonable person would have expected the holster to prevent a three year old from getting his or her hand on the trigger or removing the gun from the holster.

In support of Bushnell's argument the holster was not defectively designed under the risk-benefit test, Martini opined, "The primary design feature/application of an inside the waistband holster, such as the incident holster, is conceal ability. Secondary aspects are speed of access, security, complexity, and comfort. A variety of holsters are available today and have been for many years which range from a simple open top pouch type configuration with no retention features to elaborate internal and external retention devices. These factors are all balanced against each other and assigned priorities by the user based on their needs, preferences, and abilities. . . . The Uncle Mike[']s Number 15 Sidekick holster offers an excellent balance of speed of access, firearm security, and quality of manufacture without excessive bulk or complexity for an inside the waistband holster."

### ii. *Other causes of action*

Bushnell argued Chavez's cause of action for failure to warn failed for lack of causation and because, as a law enforcement officer, Chavez was precluded from recovering under the sophisticated user defense. As to breach of warranty, Bushnell argued there was no vertical privity because he had purchased the holster from Turner's.

### c. *Turner's motion*

Turner's raised many of the same arguments in its motion as Bushnell and was supported in part by Martini's declaration. Turner's also submitted a declaration from John Bianchi, a former police officer and manufacturer of firearms accessories. Bianchi opined the Glock 21 and holster fit and functioned normally and the condition of the holster did not indicate Chavez's gun was in the holster when fired.

### d. *Chavez's combined opposition*

### i. *Design defect*

Chavez submitted a combined opposition supported by a declaration from Carter Lord, a "legal consultant/expert on firearms and firearms safety, ballistics, protective equipment, and testing issues." Disputing defendants' characterization of the case, Chavez explained he was not contending the gun and holster should be "childproof." Rather, "the question is either whether the gun and/holster perform as safely as an ordinary consumer would expect or whether the design results in an excessive preventable danger."

### a. *The Glock 21*

Emphasizing the consumer expectation test focuses on a reasonable hypothetical consumer, not a particular plaintiff, Chavez argued a jury could find

the Glock 21 falls below minimum safety expectations in failing to have a grip safety, which would substantially decrease the risk of accidental discharge, especially by three-year-old children, with no adverse material impact on function.

With respect to the risk-benefit test, Chavez argued Lord's declaration was sufficient to create a triable issue of fact whether the benefits of the Glock 21, balanced against the feasibility and cost of alternative designs, outweigh the pistol's inherent risk of harm. Lord essentially opined the combination of design features of the Glock 21—that is, the "light trigger pull," the spring-loaded-to-fire striker ("half-cocked and unlocked") and lack of any manual safety or grip safety typically found on other pistols—created an unnecessary and dangerous risk of accidental discharge. Lord asserted proper training on a handgun with a heavier trigger pull or safety device should yield accurate or reliable performance. Lord also observed the rates of accidental discharge had increased significantly since law enforcement agencies had begun using Glock model pistols, "including having officers shoot themselves in the leg while holstering their pistols (commonly referred to as the 'Glock Leg') . . . ."

Lord also opined, even assuming a light trigger pull results in greater accuracy and a manual safety is dangerous because it requires a user to think before using the weapon, a grip safety would substantially increase the safety of the Glock 21 without adversely affecting its use even in stressful situations because it does not require any affirmative act to disengage other than gripping the gun in a firing position. According to Lord, the grip safety would have likely prevented the accident in this case because, "it is unlikely that the hand of a small child (a three year old in this case) would have the size or leverage to depress the grip safety and actually extend the finger out far enough to pull the trigger."

Regarding causation, Chavez contended Glock and Revolver Club had failed to carry their initial burden on summary judgment, explaining, although he did not have evidence of the amount of force exerted on the trigger by Collin specifically, the grip strength of children in general is subject to measurement. Chavez also argued it was reasonably foreseeable a child might pick up a firearm.

### b. *The holster*

Chavez argued a jury could find the holster did not meet ordinary consumer expectations because the Glock 21 was capable of being discharged while seated in it. According to Lord, "It is exceedingly dangerous for a holster to allow access to the holstered trigger guard of a weapon therein,

especially when doing so requires so little effort. In other words, no prying, wrenching, struggle, or tools are required to simply slip one's finger through the holster and easily into the trigger guard. I performed the maneuver myself many times (and I have particularly large fingers) and witnessed others (assisting me with test protocols) do so many times as well. . . . Further, a design change wherein the material around the outer edge of the holster (bordering the trigger guard[)] should be tighter and made of a much stiffer material."

Responding to Bushnell's contention the gun could not have been in the holster when it was fired because of the absence of discharge residue, thus defeating causation, Lord stated, "With regard to the discharge residue, the residue from a single shot appears not to show up visually on the holster. After multiple shots (6) in my case, there was visible gunshot residue at the muzzle area of the holster. I do not believe that conclusions can be made one way or the other relating to the visual presence of gunshot residue based on a single shot."

### ii. *Failure to warn*

Chavez did not dispute Glock's argument it had no duty to warn about the danger of the Glock 21 in general. Rather, Chavez argued Glock had a duty to warn the Glock 21 should only be used with specific holsters that restrict access to the trigger guard in light of the fact the gun had a light trigger pull and no manual safety device. In support of Chavez's position Lord opined, "A review of the materials sold with the Glock 21 makes no mention of the type of holster that is appropriate to be used therewith. Any reasonable manufacturer knows or should know that its pistol is highly likely to be used and carried in a holster, and a warning about the specific variety of holster appropriate for use was in this case mandatory. Glock users (and holster distributors) should have been instructed that due to the Glock 21's configuration, it is to be holstered only in a holster that restricts access to the trigger guard."

Similarly, with respect to Bushnell, Chavez argued the holster packaging should not have stated it was designed for use with Glock model pistols in light of the ease with which it could be fired when properly holstered.

### 3. *The Trial Court's Orders and Entry of Judgment*

After a hearing on July 16, 2010 the trial court granted summary judgment in favor of all defendants.

a. *Glock and Revolver Club's motions*

On August 19, 2010 the court filed its final order granting Glock and Revolver Club's motion for summary judgment. With respect to design defect under the risk-benefit test, the court found, "[T]he Glock Model 21 pistol at issue in this action is not defectively designed as a matter of law because the substantial benefits of the Glock pistol design, including the trigger pull configuration the Los Angeles Police Department specifically chose and required, and the absence of a manual safety, including a grip safety, outweigh any risk of danger that may be inherent in this design. [Citation.] The Court also finds that the plaintiffs cannot establish that any of their proposed alternative designs would have prevented this incident." The court further found Chavez could not prove the Glock 21 was defective under the consumer expectation test.

Regarding Chavez's failure to warn cause of action, the court found, "[T]he undisputed facts demonstrate that adequate warnings were provided and the plaintiffs have failed to present any evidence tending to dispute the relevant facts surrounding the various warnings on safe firearms storage that were provided to [Chavez] or that the risks associated with storing a loaded firearm where a child can reach it were obvious and were well known to [Chavez] at the time of the incident."

Based upon the same rationale the court found Chavez's causes of action for product liability and failure to warn grounded in negligence, as well as his breach of implied warranty cause of action, were without merit. The court further found the breach of warranty cause of action failed because there was no privity of contract. Inasmuch as Chavez's causes of action failed, so too did Leonora Chavez's cause of action for loss of consortium.

The court, however, rejected Glock and Revolver Club's argument Chavez's claims were barred by the PLCAA, essentially finding the alleged criminal acts by Chavez did not cause the discharge of the gun. The court explained, "[T]he alleged code violations were not violated by the shooter, and bear a tenuous relationship to the complained of injury. As such, it cannot be said that the claims are barred by this statute."

b. *Bushnell and Turner's motions*

On August 20, 2010 the trial court filed its final order granting summary judgment in favor of Bushnell. The court found Lord was not qualified to testify concerning holsters and thus disregarded his opinions on those points. The court further found the holster was not inherently dangerous and was not defectively designed either standing alone or used in conjunction with the

Glock 21. The court explained, "Bushnell adduced competent evidence, in the form of Lance Martini's declaration, that the subject holster would securely house a Glock 21 pistol and prevent its unintended firing."

With respect to Chavez's failure to warn cause of action, the court found, Chavez, as a sophisticated user, "knew or should have known of the danger and risks associated with guns and their holsters, especially when accessed by minor children, such that Bushnell had no obligation to warn him of any such dangers and risks." Moreover, even if Bushnell had a duty to warn Chavez, it was satisfied by express safety warnings accompanying the holster. Based upon these findings, the court held Chavez and Leonora Chavez's other causes of action failed as well.

On November 22, 2010 the trial court filed its final order granting summary judgment in favor of Turner's, finding there were no triable facts as to any of Chavez's causes of action and thus Leonora Chavez's derivative loss of consortium cause of action failed as well. Judgments were entered in favor of all defendants.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[7] We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) As an alternative to the difficult task of negating an element, the defendant may present evidence to "show[] that one or more elements of the cause of action . . . cannot be established" by the plaintiff. (§ 437c, subd. (p)(2); see *Aguilar*, at p. 853.) A defendant "has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence:

---

[7] Statutory references are to the Code of Civil Procedure unless otherwise indicated.

The defendant must show that the plaintiff *does not possess* needed evidence, because otherwise the plaintiff might be able to establish the elements of the cause of action; the defendant must also show that the plaintiff *cannot reasonably obtain* needed evidence, because the plaintiff must be allowed a reasonable opportunity to oppose the motion . . . ." (*Aguilar*, at p. 854; accord, *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30] ["the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence' "].) A defendant can satisfy its initial burden to show an absence of evidence through "admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing" (*Aguilar*, at p. 855), or through discovery responses that are factually devoid. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653]; accord, *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 240 [51 Cal.Rptr.3d 527].)

Only after the defendant's initial burden has been met does the burden shift to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action. (§ 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 849.) On review of an order granting summary judgment, we view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's. (*O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284 [30 Cal.Rptr.3d 507, 114 P.3d 753].)

### 2. *The Law Generally Governing Product Liability*

#### a. *Strict product liability*

██ A manufacturer or retailer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 348 [135 Cal.Rptr.3d 288, 266 P.3d 987] [strict liability extended to retailers because "as an 'integral part of the overall producing and marketing enterprise,' they too should bear the cost of injuries from defective products"].) Strict product liability may be premised upon a theory of design defect, manufacturing defect or failure to warn. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549] (*Anderson*).)

### i. *Design defect*

■ A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*).) As we explained in *McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1120–1121 [123 Cal.Rptr.2d 303] (*McCabe*), "[T]he Supreme Court [has] recognized two tests for proving design defect. ■ The 'consumer expectation test' permits a plaintiff to prove design defect by demonstrating that 'the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' [Citation.] This test, rooted in theories of warranty, recognizes that implicit in a product's presence on the market is a representation that it is fit to do safely the job for which it was intended. [Citations.] If the facts permit an inference that the product at issue is one about which consumers may form minimum safety assumptions in the context of a particular accident, then it is enough for a plaintiff, proceeding under the consumer expectation test, to show the circumstances of the accident and 'the objective features of the product which are relevant to an evaluation of its safety' [citation], leaving it to the fact finder to 'employ "[its] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." ' [Citations.] Expert testimony as to what consumers ordinarily 'expect' is generally improper. [Citation.] [Fn. omitted.]

■ "The second test for design defect is known as the 'risk-benefit test.' Under this test, products that meet ordinary consumer expectations nevertheless may be defective if the design embodies an ' "excessive preventable danger." ' [Citations.] To prove a defect under this test, a plaintiff need only demonstrate that the design proximately caused the injuries. Once proximate cause is demonstrated, the burden shifts to the defendant to establish that the benefits of the challenged design, when balanced against such factors as the feasibility and cost of alternative designs, outweigh its inherent risk of harm. [Citations.] [¶] The two tests provide alternative means for a plaintiff to prove design defect and do not serve as defenses to one another. A product may be defective under the consumer expectation test even if the benefits of the design outweigh the risks. [Citation.] On the other hand, a product may be defective if it satisfies consumer expectations but contains an excessively preventable danger in that the risks of the design outweigh its benefits. [Citation.] [¶] Whether a plaintiff may proceed under the consumer expectation test or whether design defect must be assessed solely under the risk-benefit test is dependent upon the particular facts in each case."

### ii. *Warning defect*

██ The theory underlying a warning defect cause of action is that the product is dangerous because it lacks adequate warnings or instructions. (*Barker, supra*, 20 Cal.3d at p. 428.) "Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products. [Citation.] The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use. [Citation.] Typically, under California law, we hold manufacturers strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product." (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905]; accord, *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1065–1066 [245 Cal.Rptr. 412, 751 P.2d 470]; *Anderson, supra*, 53 Cal.3d at p. 1000.) To establish strict liability for failure to warn, the plaintiff must prove the defendant "did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. . . . [T]he reasonableness of the defendant's failure to warn is immaterial." (*Anderson*, at pp. 1002–1003, fn. omitted; accord, *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1239 [115 Cal.Rptr.3d 151].)

There is no duty to warn of known risks or obvious dangers. (*Johnson v. American Standard, Inc., supra*, 43 Cal.4th at p. 67; see *Holmes v. J. C. Penney Co.* (1982) 133 Cal.App.3d 216, 220 [183 Cal.Rptr. 777] [dangers and potential harms associated with $CO_2$ cartridges used to power pellet gun were obvious; seller need not warn about them].) Additionally, "[a] manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger." (*Johnson*, at p. 71.) This affirmative defense is " 'a natural outgrowth of the rule that there is no duty to warn of known risks or obvious dangers.' " (*Id.* at p. 67.) The defense applies both to a cause of action that a failure to warn resulted in strict liability and a cause of action that a failure to warn was negligent. (*Id.* at p. 71.)

### b. *Negligent product liability*

### i. *Design defect*

██ As with an action asserted under a strict liability theory, under a negligence theory the plaintiff must prove a defect caused injury. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 479 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

However, "[u]nder a negligence theory, a plaintiff must also prove 'an additional element, namely, that the defect in the product was due to negligence of the defendant.' " (*Id.* at p. 479; see *Barker, supra,* 20 Cal.3d at p. 434 [negligent design cause of action focuses on the reasonableness of the manufacturer's conduct, not the product itself].)

"[T]he test of negligent design 'involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm.' [Citation.] . . . 'A manufacturer or other seller can be negligent in marketing a product because of the way it was designed. In short, even if a seller had done all that he could reasonably have done to warn about a risk or hazard related to the way a product was designed, it could be that a reasonable person would conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as so designed.' [Citation.] Thus, 'most of the evidentiary matters' relevant to applying the risk/benefit test in strict liability cases 'are similar to the issues typically presented in a negligent design case.' " (*Merrill v. Navegar, Inc., supra,* 26 Cal.4th at pp. 479–480.)

#### ii. *Failure to warn*

"Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." (*Anderson, supra,* 53 Cal.3d at p. 1002.)

### 3. *The Trial Court Erred in Granting Summary Judgment in Favor of Glock and Revolver Club; Summary Adjudication of Chavez's Failure to Warn Causes of Action Is Proper*

#### a. *Causation as an element of Chavez's design defect cause of action*

Whether proceeding under a consumer expectation or risk-benefit test, one essential element of Chavez's cause of action for strict liability-design defect is proof the Glock 21's design (and its corresponding failure to perform safely) was a substantial factor in causing his injury. Analyzing the trigger pull, lack of a manual safety and lack of grip safety separately, Glock and Revolver Club argue Chavez cannot establish that modification of any of these alleged defects would have prevented the accident.

We agree Chavez cannot demonstrate the lack of a manual safety proximately caused his injury in light of the undisputed evidence that, consistent

with his training, he always carried and stored his Beretta pistol with the manual safety disengaged. (See *Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1617 [286 Cal.Rptr. 402] [even if location of parking brake constituted design defect, plaintiff could not establish causation because brake was inoperable due to improper maintenance].) Glock and Revolver Club, however, have failed to carry their initial burden to demonstrate Chavez cannot prove the lack of a grip safety or the light trigger pull caused his injury.

Glock and Revolver Club's causation argument is primarily predicated on Chavez's concession he cannot prove either the amount of force Collin exerted on the pistol when he discharged it or the manner in which he held the pistol. Misconstruing both the nature of causation evidence needed by Chavez to prove his strict liability cause of action and their own burden on summary judgment, Glock and Revolver Club assert Chavez would have to show that Collin was physically incapable of exerting the amount of force necessary to fire a gun with a heavier trigger pull and that Collin could not have deactivated a grip safety by some means other than a normal single-handed grip (for example, by holding the gun in one hand and pulling the trigger with the other or by leaning his body against the handle). Such argument alone is insufficient to meet Glock and Revolver Club's initial burden either to conclusively negate causation or to demonstrate Chavez does not have, and cannot reasonably obtain, evidence establishing causation. (See *Aguilar, supra,* 25 Cal.4th at pp. 853, 855 & fn. 23 [defendant does not meet its burden on summary judgment "simply" by pointing out " '*absence of evidence* to support' an element of the plaintiff's cause of action"]; *Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1003.)

██ To establish Chavez did not have, and could not reasonably obtain, evidence proving causation, Glock and Revolver Club were required to present evidence Chavez could not obtain an expert opinion stating it is unlikely a three-year-old child could discharge a pistol with a grip safety. In fact, Chavez did present such an expert opinion: Lord opined, "[I]f a child's hand was in the proper position to knowingly fire (hand on across the grip with index finger extended) it is unlikely that the hand of a small child (a three year old in this case) would have the size or leverage to depress the grip safety and actually extend the finger out far enough to pull the trigger." Although Glock and Revolver Club dispute the value of Lord's opinion, arguing it is conclusory, speculative and lacking in evidentiary support, because Glock and Revolver Club did not shift the burden to Chavez to

demonstrate there is a triable issue of fact on causation, the persuasive effect of Lord's opinion is not now before us.[8]

To be sure, the absence of direct evidence regarding how Collin fired the gun renders the causation question more difficult to resolve. But it is neither impossible to prove causation nor is proof on this issue necessarily speculative. (Cf. *Arthur v. Avon Inflatables Ltd.* (1984) 156 Cal.App.3d 401, 407–408 [203 Cal.Rptr. 1] [whether an emergency transmitter device "could have properly functioned and its signal been received by passing aircraft so as to produce at least a chance of successful rescue [citation] presented a factual question on the issue of contributing proximate cause"].) The hand size and grip strength of children are readily measurable. Although there may be some variation among individual children, the jury could reasonable infer from such evidence whether a child of Collin's age and size could depress a grip safety. Similarly, a child's ability to pull a trigger of various trigger pull strengths is measurable. (See Naureckas et al., *Children's and Women's Ability to Fire Handguns* (1995) 149 Archives Pediatrics & Med. 1318 <http://www.ncbi.nlm.nih.gov/pubmed/7489067> [as of July 24, 2012] [study of one- and two-index-finger trigger pull strength of mothers and children].) A jury could reasonably infer from this information whether a heavier trigger would have reduced or avoided the risk of harm in this case. (See *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 121 [184 Cal.Rptr. 891, 649 P.2d 224] [" '[i]t is not incumbent upon a plaintiff to show that an inference in his favor is the only one that may be reasonably drawn from the evidence; he need only show that the material fact to be proved may logically and reasonably be inferred from the circumstantial evidence' "].)

Indeed, as the Supreme Court explained in *Campbell v. General Motors Corp., supra,* 32 Cal.3d 112, "It is particularly appropriate that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present. To take the case from the jury simply because the plaintiff could not prove to a certainty that the device would have prevented the accident would enable the manufacturer to prevail on the basis of its failure to provide the safeguard. [Citation.] Such a rule would provide a disincentive to improve the safety features of a product and thereby interfere with one of the major policy goals of strict liability." (*Id.* at p. 121, fn. omitted.)

[8] Kapelsohn's testimony it "is quite likely" Collin would have depressed a grip safety while firing the pistol either by pulling the trigger with both hands or supporting the rear of the pistol with one hand while placing a finger of the other hand into the trigger guard, although potentially convincing if presented to a jury, falls short of conclusively negating causation. Thus, it was incumbent on Glock and Revolver Club to demonstrate Chavez could not obtain evidence to prove this element of his cause of action.

### b. *Lack of causation as an affirmative defense*

■ Glock and Revolver Club's alternative contention Chavez's failure to safely store the Glock 21 was the sole proximate cause of his injuries is not an appropriate ground for granting summary judgment. Product misuse, an affirmative defense, is a superseding cause of injury that absolves a tortfeasor of his or her own wrongful conduct only when the misuse was " 'so highly extraordinary as to be unforeseeable.' " (*Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 681 [115 Cal.Rptr.3d 590]; see *Soule, supra*, 8 Cal.4th at p. 573, fn. 9 [complete defense of superseding cause appropriate when "an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible"]; see generally CACI No. 1245 ["Affirmative Defense—Product Misuse or Modification"].) "However, foreseeability is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion." (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 19 [56 Cal.Rptr.2d 455].)

There is no question children gain access to firearms. Indeed, Glock's own safety warnings and Penal Code section 25100 making it a criminal offense under certain circumstances to store firearms where children have access to them make this clear. While a jury may well find Chavez's conduct substantially contributed to the accident (see *Torres v. Xomox Corp., supra*, 49 Cal.App.4th at p. 17; see generally CACI No. 1207A ["Strict Liability—Comparative Fault of Plaintiff"]), we cannot say that conduct, even if sufficient to establish criminal storage of a firearm, absolves Glock and Revolver Club, as a matter of law, from all liability for a design defect that may otherwise be shown to exist in the Glock 21. (Cf. *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833 [20 Cal.Rptr.2d 296] [" '[T]he law now requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse.' [Citation.] '[T]he extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact.' "].) Chavez's responsibility for his own injuries is quintessentially a question for the jury.

### c. *The risk-benefit test*

■ In evaluating the adequacy of a product's design under the risk-benefit test, "a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the

product and to the consumer that would result from an alternative design." (*Barker, supra*, 20 Cal.3d at p. 431.) Examining these factors, Glock and Revolver Club contend undisputed evidence establishes the benefits of the Glock 21's 5.5-pound trigger connector and absence of a manual or grip safety to law enforcement officers clearly outweigh any risks of a design that might only marginally contribute to preventing the rare occurrence of a three year old accidentally discharging the pistol while playing with it in the back of a truck.

Without a doubt, Glock and Revolver Club proffered substantial expert evidence establishing the merits of the Glock 21 and supporting the Department's decision to select the weapon for general agency use. Nevertheless, Chavez provided his own expert evidence that there are safer designs that would accomplish the Department's goals without adversely impacting safety or accuracy. For example, Lord opined the inclusion of a grip safety on a gun with the 5.5-pound connector trigger pull of the Glock 21 and lack of manual safety would minimize the risk of accidental discharge without undermining performance because "[n]o additional thought or hesitation is required in a high stress situation" to knowingly and intentionally fire the gun.

Glock and Revolver Club insist Lord's opinion is not substantial evidence and fails to create a triable issue of fact under the risk-benefit test because it is conclusory and unsupported by facts and Lord, who is not a firearms trainer, has no experience instructing others on the safe and effective use of firearms (see § 437c, subd. (d) [supporting and opposing declarations "shall show affirmatively that the affiant is competent to testify to the matters stated in the . . . declarations"].) The trial court, however, overruled Glock and Revolver Club's objections to Lord's declaration. Glock and Revolver Club do not directly challenge these evidentiary rulings on appeal, which we accordingly do not disturb. (See *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [120 Cal.Rptr.2d 281].) Thus, their attempt to dismiss the significance of Lord's declaration goes only to the weight of the evidence, not its complete absence. Determining the credibility of expert witnesses and deciding whether Kapelsohn's risk-benefit opinion is entitled to greater weight than Lord's are questions for the jury.[9]

---

[9] An expert opinion based upon " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.' " (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1110 [131 Cal.Rptr.2d 1, 63 P.3d 913].) However, Lord's opinion a pistol with a grip safety provided a feasible alternative to the current design of the Glock 21 was not merely based on surmise or conjecture. Lord stated the M1911, which has a grip safety, was the service weapon of choice for the military until the mid-1980's and other pistols with grip safeties are now used by various police agencies. Even Kapelsohn acknowledged some law enforcement agencies use a pistol with a grip safety. While that pistol may not

■■■■■■■■■■■■■■■■■

### d. *The consumer expectation test*

██ As discussed, whether a plaintiff may proceed under the consumer expectation test or whether design defect must be assessed solely under the risk-benefit test is dependent upon the particular facts in each case. The critical question is whether the "circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule, supra*, 8 Cal.4th at pp. 566, 568–569; see *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1311–1312 [120 Cal.Rptr.3d 605].) Because " ' "[i]n many situations . . . the consumer . . . would have *no idea* how safe the product could be made," ' " the consumer expectation test is "reserved for [those] cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design.*" (*Soule*, at pp. 562, 567, some italics omitted.) In those cases where an injury has been caused "in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance" (*id.* at pp. 566–567), and the plaintiff's theory of defect seeks to examine the behavior of "obscure components . . . under . . . complex circumstances" outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit analysis (*id.* at p. 570 [where automobile collision resulted in left front wheel breaking free, collapsing rearward and smashing floorboard into driver's feet, it was error to instruct jury with consumer expectation test; proper test for defect is risk-benefit because behavior of obscure component parts during complex circumstances of accident not within ordinary experience of consumer]; see *Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 793–795 [109 Cal.Rptr.2d 343] [consumer expectation test inapplicable to assess defect in latex glove where chemical in the rubber caused allergic reactions in those sensitive to latex]).

Glock and Revolver Club do not argue the consumer expectation test is not applicable to Chavez's cause of action for design defect and do not dispute Chavez's assertion it would be error to conclude the test is inapplicable here as a matter of law. (See *Soule, supra*, 8 Cal.4th at p. 568; *McCabe, supra*, 100 Cal.App.4th at p. 1124.)[10] Rather, they contend ordinary consumers of

_____

enjoy the popularity of the Glock with law enforcement agencies, the existence of an alternative design in actual, albeit limited, use demonstrates Lord's opinion was grounded in fact.

[10] The initial determination whether the consumer expectation test is properly applied to a particular case is for the court. (*Saller v. Crown Cork & Seal Co., Inc., supra*, 187 Cal.App.4th at p. 1233; *McCabe, supra*, 100 Cal.App.4th at pp. 1125–1126, fn. 7.) If the trial court finds there is " 'sufficient evidence to support a finding that the ordinary consumer can form

firearms, as a matter of law, would not reasonably expect a loaded and unlocked firearm could be safely left within a child's reach.

■ If a plaintiff proceeds under the consumer expectation test, "in addition to establishing a prima facie case regarding causation, the plaintiff must also produce evidence that the product failed to satisfy ordinary consumer expectations as to safety." (*Campbell v. General Motors Corp., supra*, 32 Cal.3d at p. 126; see *Barker, supra*, 20 Cal.3d at p. 430.) In *Campbell* the plaintiff, who was injured while riding on a city bus, contended the bus was defectively designed because her seat lacked a handrail or guardrail and, at trial, produced evidence "sufficient to establish the objective conditions of the product." (*Campbell*, at p. 126.) Reversing a nonsuit in favor of the defendant manufacturer, the Supreme Court explained that was sufficient for the case to be submitted to the jury on the consumer expectation theory: "The other essential aspect of this test involves the jurors' own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." (*Ibid.*) "[I]t is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety." (*Id.* at p. 127.)

Pursuant to *Campbell*, once a plaintiff establishes the consumer expectation test is properly applied to his or her case, the threshold for withstanding a motion for summary judgment or nonsuit, thus permitting the jury to determine whether the allegedly defective product satisfied ordinary consumer expectations, is quite low. Nonetheless, as the Supreme Court cautioned in *Soule, supra*, 8 Cal.4th at page 568, "[T]he jury may not be left free to find a violation of ordinary consumer expectations whenever it chooses." (See *Campbell v. General Motors Corp., supra*, 32 Cal.3d at p. 127 ["[t]he quantum of proof necessary to establish a prima facie case of design defect under the [consumer expectation test] cannot be reduced to an easy formula"].)

We agree with the trial court that this is one of those perhaps exceptional cases in which the product at issue is one about which consumers may form minimum safety assumptions but no jury could reasonably conclude the product failed to perform under the circumstances as safely as an ordinary consumer would expect. That is, no reasonable consumer—whether relatively

reasonable minimum safety expectations, the court should instruct the jury . . . to determine whether the consumer expectation test applies to the product at issue in the circumstances of the case [or] to disregard the evidence about consumer expectations . . . . If it finds the test applicable, the jury then must decide whether the product failed to perform as safely as an ordinary consumer would expect when the product is used in an intended or reasonably foreseeable manner.' " (*Saller*, at p. 1234.)

inexperienced with firearms or a seasoned law enforcement officer—would expect an unlockable and loaded weapon, left in ready-to-fire condition in a location accessible to a child or other unauthorized users, not to accidentally discharge. The facts of this case do not " 'actually permit an inference that the [Glock 21's] performance did not meet the minimum safety expectations of its ordinary users.' " (*Saller v. Crown Cork & Seal Co., Inc., supra,* 187 Cal.App.4th at p. 1233; see *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 424–425, 426–428 [136 Cal.Rptr.3d 739] [affirming summary judgment against plaintiff who had slipped in hotel bathtub; bathtub manufacturer not liable for guest's injury on theories of negligence or strict product liability under either consumer expectation or risk-benefit tests].)

Risk-benefit and consumer expectation are alternative theories for establishing a cause of action for design defect strict liability, not independent causes of action. Accordingly, notwithstanding Chavez's inability to prove design defect under the consumer expectation test, Glock and Revolver Club are not entitled on remand to an order granting summary adjudication on this claim. (See § 437c, subd. (f)(1) ["[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . ."]; see also *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 418–419 [54 Cal.Rptr.2d 792] [motion for summary adjudication may not attack one particular compensatory damage claim if granting the motion would leave intact the cause of action containing other claims for compensatory damages].) However, the trial court, Glock and Revolver Club are not without procedural devices, including, for example, a motion in limine, to deal with the consumer expectation claim when this matter is returned for trial. (See *Hindin v. Rust* (2004) 118 Cal.App.4th 1247, 1259–1260 [13 Cal.Rptr.3d 668]; see also § 437c, subd. (s) [party may move for summary adjudication of a legal issue or claim that does not completely dispose of a cause of action upon stipulation of the parties and approval of the court if resolution of the motion will reduce trial time or significantly increase the likelihood of settlement].)

e. *The failure to warn cause of action*

 Chavez contends the trial court misconstrued his failure to warn cause of action. He argues the question was not whether Glock had a duty to warn about the dangerousness of the Glock 21 in general or the best practices for storage—warnings that the trial court found were adequate—but whether Glock had a duty to warn his firearm should only be used with specific holsters that restrict access to the trigger guard in light of the light trigger pull and lack of a manual safety device. Even as framed by Chavez and crediting for purposes of the summary judgment motion his contention he was not storing the pistol but using it as he had been trained to do, the cause of action

fails. Chavez was a sophisticated user (cf. *Johnson v. American Standard, Inc., supra,* 43 Cal.4th at pp. 74–75 [no triable issue of fact trained and certified HVAC technician should have known of risks posed by exposure to refrigerant]) and was fully familiar with the Glock 21 and its light trigger pull and lack of safety devices. As such, no warnings concerning the need to use a holster that would prevent accidental discharge were required: "A manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger." (*Johnson,* at p. 71; see *id.* at p. 65 ["Under the sophisticated user defense, sophisticated users need not be warned about dangers of which they are already aware or should be aware. [Citation.] Because these sophisticated users are charged with knowing the particular product's dangers, the failure to warn about those dangers is not the legal cause of any harm that product may cause."]; see also *Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549, 559 [101 Cal.Rptr.3d 726] (*Honeywell*) [" 'rationale supporting the defense is that "the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers" ' "].)

Chavez received firearms training as a United States Marine for four years and as a police officer for 10 years. Additionally, Chavez testified he began carrying the Glock 21 as a service weapon after he had passed a transition course; had read the instruction manual for the pistol;[11] had been using holsters since 1996; had always used an inside-the-belt holster like the Uncle Mike's Sidekick Ambidextrous Hip Holster for off-duty use of his Beretta; carried his pistol, whether the Beretta or the Glock, off duty with "a lot" of frequency; chose the Uncle Mike's holster from a selection of two shown to him by the salesperson at Turner's because he thought it was "neat"; and had used the holster a few hundred times before the incident. (See *Johnson v. American Standard, Inc., supra,* 43 Cal.4th at p. 74 ["the sophisticated user's knowledge of the risk is measured from the time of the plaintiff's injury, rather than from the date the product was manufactured"].) Thus, given his extensive training and use of firearms in general and three years' experience with the Glock 21 and the Uncle Mike's holster, Chavez knew or should have known of any risk involved in the use of this pistol and the holster.

Chavez does not dispute he is a sophisticated user. He argues, correctly, the sophisticated user defense does not bar a design defect cause of action asserted under a risk-benefit theory. (See *Honeywell, supra,* 179 Cal.App.4th at p. 558.) But, as in *Honeywell,* Chavez asserts both a design defect cause of

---

[11] The manual explains the "weapon has no conventional, externally located safety lever"; therefore, the user is warned to "make sure that the trigger is touched only if you intend to fire."

action based on the risk-benefit test regarding the product itself—in this case the design of the pistol; in *Honeywell* the design of the refrigerant (*id.* at pp. 558, 559)—and a separate cause of action based on Glock and Revolver Club's failure to warn of the dangers of using the product. (See *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1669 [26 Cal.Rptr.3d 638] ["[p]roduct liability under a failure-to-warn theory is a distinct cause of action from one under the consumer expectation test"].) And, as in *Honeywell*, the sophisticated user defense is applicable to the failure to warn cause of action even though it is not applicable to the design defect cause of action based on the risk-benefit test. (See *Honeywell*, at pp. 556 [sophisticated user defense applies to failure to warn cause of action based on negligence], 559 [sophisticated user defense is not applicable to design defect cause of action that is not concerned with warnings].) On remand the trial court should enter an order of summary adjudication in favor of Glock and Revolver Club on Chavez's failure to warn causes of action asserted under both strict liability and negligence theories. (See *Johnson v. American Standard, Inc., supra,* 43 Cal.4th at p. 71 [sophisticated user defense applies to both negligence and strict liability causes of action for failure to warn].)

### f. *Chavez's remaining causes of action*

#### i. *Negligent design defect*

On appeal Glock and Revolver Club argue for the first time they had no duty to design a firearm that an unsupervised three year old could safely play with when left loaded and unsecured by a trained police officer who had ignored every warning and instruction he had read about firearm storage safety. Even if not forfeited for failure to raise it in the trial court (see *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664] [issues not raised in trial court cannot be raised for first time on appeal]), this claim is without merit. In *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772 [122 Cal.Rptr.3d 313, 248 P.3d 1170], the Supreme Court made clear the question whether an exception is warranted to Civil Code section 1714's general duty of ordinary care should be evaluated at a relatively broad level of generality to "preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (See *Cabral*, at p. 772 [essential question is not whether facts of particular case justify departure from the general duty rule, "but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy"].) The fact-specific duty analysis Glock and Revolver Club posits presents a question of breach, not duty.

Because " 'most of the evidentiary matters' relevant to applying the risk/benefit test in strict liability cases 'are similar to the issues typically presented in a negligent design case' " (*Merrill v. Navegar, Inc., supra,* 26 Cal.4th at p. 480), for the reasons discussed above in connection with his strict liability cause of action, summary adjudication on Chavez's cause of action for negligent design is not warranted.

### ii. *Breach of implied warranty*

 The essential dispute over Chavez's breach of implied warranty cause of action has been whether there is privity of contract between Chavez, on the one hand, and Glock and Revolver Club, on the other hand, because Chavez was injured by his partner's identical pistol after they had inadvertently switched weapons. Generally, a cause of action for breach of implied warranty requires privity of contract; "there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." (*Burr v. Sherwin Williams Co.* (1954) 42 Cal.2d 682, 695 [268 P.2d 1041]; accord, *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 720 [110 Cal.Rptr.2d 722]; see *Jones v. ConocoPhillips* (2011) 198 Cal.App.4th 1187, 1201 [130 Cal.Rptr.3d 571[.)

"There are, of course, multiple court-created exceptions to the general rule of privity. [Citation.] For example, exceptions to the privity requirement have been found in cases involving foodstuffs, drugs and pesticides, [and] substances marketed with the knowledge the purchaser may not be the ultimate consumer of the product [citations]. The strict requirement of privity has also been excused when an inherently dangerous instrumentality causes harm to a buyer's employee. [Citations.] Whether these cases are viewed as expanding the doctrine of privity or relieving a plaintiff of the obligation to demonstrate privity in favor of the emerging tort doctrine of strict liability [citations], the result is the same." (*Jones v. ConocoPhillips, supra,* 198 Cal.App.4th at p. 1201.) Inasmuch as the guns were identical and the alleged breach of implied warranty is not specific to a particular model number, but the overall design of the Glock 21, Chavez is entitled to assert a cause of action for breach of implied warranty. (Cf. *Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 247 [71 Cal.Rptr. 306] ["in cases involving instrumentalities dangerous because of latent defects, implied warranties apply even in the absence of privity"].)

### iii. *Leonora Chavez's loss of consortium cause of action*

 Leonora Chavez's loss of consortium cause of action can only be maintained if one of Chavez's causes of action against Glock and Revolver Club is successful. (*Vanhooser v. Superior Court* (2012) 206 Cal.App.4th 921,

928 [142 Cal.Rptr.3d 230] ["[w]ithout injury to the spouse, the plaintiff has no loss of consortium claim"]; see *Meighan v. Shore* (1995) 34 Cal.App.4th 1025, 1034–1035 [40 Cal.Rptr.2d 744] ["an unsuccessful personal injury suit by the physically injured spouse acts as an estoppel that bars the spouse who would claim damages for loss of consortium"]; *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1067 [272 Cal.Rptr. 250].) Because it was error to grant Glock and Revolver Club's motion for summary judgment with respect to Chavez's causes of action for design defect (both strict liability and negligence) and breach of implied warranty, the order granting their motion against Leonora Chavez must also be reversed.

### 4. There Are Triable Issues of Fact Whether Chavez's Causes of Action Are Barred by the PLCAA

The PLCAA was enacted in 2005 in part to prevent lawsuits against manufacturers and distributors of firearms and ammunition products "for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." (15 U.S.C. § 7901(b)(1); see *Ileto v. Glock, Inc.* (C.D.Cal. 2006) 421 F.Supp.2d 1274, 1289 ["clear purpose of the PLCAA was to shield firearms manufacturers and dealers from liability for injuries caused by third parties using non-defective, legally obtained firearms"; "Congress also believed that lawsuits seeking to hold firearms manufacturers liable for a third party's misuse of a firearm imposed an undue burden on interstate commerce."].) Accordingly, the Act defines "a qualified civil liability action" as "a civil action or proceeding . . . brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . ." (15 U.S.C. § 7903(5)(A).) In keeping with the purpose of the Act to shield the firearm industry from liability when the product is properly designed and functions as intended, product defect actions are *excluded* from the definition of qualified civil liability actions *unless* the discharge of the firearm "was caused by a volitional act that constituted a criminal offense" in which case "such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage . . . ." (15 U.S.C. § 7903(5)(A)(v).)[12]

Ordinarily "[t]he proper analysis for determining the applicability of the PLCAA is two-fold," requiring first a determination whether the lawsuit in

---

[12] Other exclusions include "action[s] for breach of contract or warranty in connection with the purchase of the product" and "action[s] in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought . . . ." (15 U.S.C. § 7903(5)(A)(iv), (iii).)

question is a " 'qualified civil liability action' " and second an analysis whether, if it is, "any of the PLCAA's six exceptions to this definition apply." (*Ryan v. Hughes-Ortiz* (2012) 81 Mass.App.Ct. 90 [959 N.E.2d 1000, 1007].) Here, however, the parties and the trial court presumed Chavez's action was a qualified civil liability action and focused on whether the product defect exception was applicable. We have serious doubts whether this assumption was correct and whether Chavez's action is a qualified civil liability action as defined by the PLCAA. Glock and Revolver Club insist Chavez is seeking damages resulting from the criminal misuse of his firearm—its storage in violation of Penal Code former section 12035 (now § 25100), a felony. But one of Chavez's principal factual contentions is that he was not "storing" his Glock at all, but using it in a manner consistent with his training to provide protection while he was off duty. If proved, this would appear to qualify as an exception to the definition of the offense.[13]

In any event, there are triable issues of fact whether Chavez's lawsuit falls within the exception to the Act for product defect actions under the second step of the analysis. (15 U.S.C. § 7903(5)(A)(v).) Chavez focuses on his son's actions in firing the weapon and argues the discharge of the pistol was not caused by a volitional criminal act because his three-year-old son did not possess the requisite criminal intent (that is, knowledge of wrongfulness) when he pulled the trigger. (See Pen. Code, § 26 [children under age of 14 are not capable of committing a crime "in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness"].) Glock and Revolver Club dispute the exception applies, looking not to Collin's actions, but Chavez's. They argue the discharge of the gun was caused by Chavez's volitional criminal acts of leaving the loaded pistol unsecured in his truck and placing Collin in the backseat of his truck, just a few feet away from the pistol, without being secured in a child car seat.

Unlike the definition of "a qualified civil liability action," which broadly includes any civil action "resulting from the criminal or unlawful misuse" of a firearm, Congress much more narrowly defined the exclusion from excepted product defect suits to apply only if "the discharge of the product was caused

---

[13] Under Penal Code section 25100, which renumbered Penal Code former section 12035 without substantive change, effective January 1, 2012 (see Stats. 2010, ch. 711, § 6), a person commits the crime of " 'criminal storage of a firearm' " if he or she "keeps any loaded firearm within any premises that are under the person's custody or control," "knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian" and "[t]he child obtains access to the firearm and thereby causes death or great bodily injury to the child or any other person." (Pen. Code, § 25100, subd. (a).) However, there is no criminal violation when "[t]he firearm is carried on the person or within close enough proximity thereto that the individual can readily retrieve and use the firearm as if carried on the person" (Pen. Code, § 25105, subd. (c)) or "[t]he person is a peace officer . . . and the child obtains the firearm during, or incidental to, the performance of the person's duties" (*id.*, subd. (e)).

by a volitional act that constituted a criminal offense . . . ." (15 U.S.C. § 7903(5)(A)(v).) By specifically linking the actual act of discharge to the criminal offense, as it did, we do not believe Congress intended, as Glock and Revolver Club argue, to allow any unlawful act in the causal chain, however remote from the actual firing of the weapon, to defeat the exclusion. Indeed, to construe the exclusion as expansively as do Glock and Revolver Club, would effectively eliminate the exception for product design defect claims expressly provided by Congress.[14]

Even if we were to accept Glock and Revolver Club's statutory interpretation, however, material issues of fact exist that preclude summary judgment under the PLCAA. As discussed, Chavez has not conceded, nor is it a foregone conclusion, that he committed the offense of criminal storage of a firearm.[15]

5. *The Trial Court Properly Granted Summary Judgment in Favor of Bushnell and Turner's*[16]

a. *The trial court abused its discretion in excluding Lord's declaration*

 "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720,

---

[14] Statutory construction is a question of law for the court. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) In construing statutes "[o]ur fundamental task . . . is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute[s]. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; accord, *People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].)

[15] Glock and Revolver Club also note Chavez placed Collin in the rear jump seat of his truck without securing him in a child seat as required by Vehicle Code section 27360, subdivision (a). At the time of the incident, a car seat violation was punishable by a fine of $100. (See Stats. 2003, ch. 524, § 2, p. 3992.) Such an infraction is not the kind of criminal offense supportive of immunity from product liability actions under the PLCAA. (See 15 U.S.C. § 7901(b)(1) [purpose of the Act is to prohibit claims against firearms manufacturers, among others, for "the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products"].)

[16] In his briefs on appeal Chavez does not address Turner's separately from Bushnell.

subd. (a).) However, "work in a particular field is not an absolute prerequisite to qualification as an expert in that field." (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 274 [7 Cal.Rptr.2d 101].) For example, "[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion." (*People v. Catlin* (2001) 26 Cal.4th 81, 131 [109 Cal.Rptr.2d 31, 26 P.3d 357], citing *People v. Villarreal* (1985) 173 Cal.App.3d 1136, 1142 [219 Cal.Rptr. 371] ["[b]ecause of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise"]; *Brown v. Colm* (1974) 11 Cal.3d 639, 645 [114 Cal.Rptr. 128, 522 P.2d 688] ["unmistakable general trend in recent years . . . toward liberalizing the rules relating to the testimonial qualifications of medical experts"].) The determinative factor is whether the expert "has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth." (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38 [210 Cal.Rptr. 762, 694 P.2d 1134].) The degree of expertise goes to the weight of the expert's testimony, not its admissibility. (*People v. Farnam* (2002) 28 Cal.4th 107, 162 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

"It is true . . . that the question whether a witness qualifies as an expert is a matter addressed in the first instance to the sound discretion of the trial court. [Citation.] It is also elementary, however, that the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury." (*Brown v. Colm, supra*, 11 Cal.3d at pp. 646–647 [trial court erred in excluding doctor's testimony "based entirely upon his lack of personal experience with the standard of care prevailing in 1949"].)

The trial court abused its discretion in excluding Lord's opinion the gun was in the holster when it was discharged. Lord's experience and expertise in the field of firearms and ballistics are broad.[17] With respect to performing tests specifically to determine whether the gun was in the holster when it was fired, Lord stated, "I have performed forensic reconstruction work of this

---

[17] According to his declaration, Lord has more than 30 years of experience as a design engineer "involved in all aspects of mechanical engineering design and analysis of firearms, other weapons systems and related equipment" and "as a Gunsmith, proficient in the design, manufacture, repair and restoration of a wide variety of handguns, rifles and shotguns." He has "performed ballistics and terminal effects experiments and developed several innovative special purpose small arms projectile and weapons subsystems." His areas of expertise include "testing and evaluation of firearms, firearm design assessment, design optimization, product development, ammunition, body armor and other law enforcement equipment . . . ." Additionally, he has worked with various law enforcement and correction agencies, including the National Institute of Science and Technology—Office of Law Enforcement Standards, for which he reviewed and revised "national law enforcement equipment standards . . . ."

nature over the course of my career in firearm design, repair, accident reconstruction, National Standard Development and Medical Legal Death Investigation." Indeed, determining whether the absence of gunshot residue conclusively established the gun was not in the holster when it was fired did not require highly technical skill or experience, but simply the firing of the gun and a visual inspection. Bushnell's expert, Martini, opined, "[Gunshot residue], even if the interior of the holster was cleaned after discharge, would have embedded within the nylon fibers and could be readily seen." Lord's education, experience and training clearly qualified him for and encompassed such testing.

Because we hold Lord's additional opinion the holster's design was defective is insufficient to create a triable issue of fact under the risk-benefit test, we need not address whether his failure to identify holster design as one of his areas of expertise renders this aspect of his opinion testimony inadmissible.

 b. *There are triable issues of fact whether the holster caused Chavez's injuries*

Chavez testified the Glock 21 was still in the holster when he picked it up immediately after being shot. That testimony, together with Lord's opinion the absence of gunshot residue did not necessarily mean the gun was out of the holster when it was discharged, create a triable issue of fact on causation. Martini and Lord submitted declarations presenting contradictory opinions on the issues of the absence of gunshot residue on the holster, whether the gun could be fired with the retention snap fastened and the conclusions to be drawn from the stovepipe jam. That conflict cannot properly be resolved on summary judgment.

Bushnell's additional arguments on causation are without merit. The fact the holster is not itself dangerous and did not fire the bullet does not defeat causation. A product manufacturer may be held liable in strict product liability or negligence "for harm caused by another manufacturer's product" when "the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." (*O'Neil v. Crane Co., supra*, 53 Cal.4th at p. 342.) The gravamen of Chavez's claim against Bushnell is that the holster contributed substantially to the harm because it failed to adequately protect the trigger.

Bushnell's argument it was not reasonably foreseeable a law enforcement officer would leave a holstered gun accessible to a child does not necessarily defeat causation for the reasons we explained in connection with Glock's similar argument regarding the pistol: Children gain access to firearms.

Although law enforcement officers have more training than civilian gun owners, and presumably have heightened awareness about the need to secure their weapons to prevent unauthorized access, an officer's daily use of a weapon can also create more opportunities for inadvertent access. As demonstrated by the instant case, law enforcement officers are not immune from long shifts and circumstances that impair their ability to maintain vigilance about gun safety. Any issue of foreseeability is properly for the jury to resolve.

> c. *Chavez has failed to demonstrate a triable issue of fact the holster is defective under the risk-benefit test*

Martini's declaration was sufficient evidence to shift the burden to Chavez to demonstrate there is a triable issue of fact whether "the benefits of the challenged [holster] design, [when balanced against such factors as the feasibility and cost of alternative designs,] outweigh [its inherent risk of harm]." (*Barker, supra,* 20 Cal.3d at p. 432.) In support of his opinion the holster provides "an excellent balance of speed of access, firearm security, and quality of manufacture without excessive bulk or complexity for an inside the waistband holster," Martini explained it offers, among other benefits, a "[s]emi-rigid design allowing for one handed reholstering (important officer safety aspect)"; "[f]ull enclosure of the pistol's trigger and trigger guard area by the holster's shell thus minimizing access to these areas while the pistol is inserted in the holster even when the retention snap is not engaged"; and "[f]oam/nylon laminate construction which allows for a lightweight, low bulk and comfortable holster yet possessing the required integrity to properly support, position and secure a large and heavy firearm such as the fully loaded Glock 21 pistol."

In his opposing declaration Lord does not address the fact one of the key design features of this particular holster is conceal ability or evaluate the feasibility, costs and benefits of an alternative design that would still provide sufficient conceal ability while adding an additional margin of safety. Rather, he merely described in conclusory fashion "a design change wherein the material around the outer edge of the holster (bordering the trigger guard[)] should be tighter and made of stiffer material."[18] That is insufficient to create a triable issue of material fact whether the holster's design presents an "excessive preventable danger." (See *Lockheed Martin Corp. v. Superior*

---

[18] Lord also opined an additional problem with the holster design is "that it is non-specific in that it can be used with a wide variety of guns. Accordingly, the holster is not form fit/molded to the Glock's dimensions thus allowing such easy access." The product under scrutiny, however, is a holster designed for use with several different models of firearms. Bushnell was not required to design and sell a different product, that is, one for use exclusively for a particular model Glock product, but to safely design the product it chose to manufacture.

*Court, supra*, 29 Cal.4th at p. 1110 [expert's opinion must rest on relevant, probative facts; if not, it cannot constitute substantial evidence].)[19]

 d. *Chavez has failed to demonstrate a triable issue of fact the holster is defective under the consumer expectation test*

■ Expert testimony as to what consumers ordinarily expect is generally improper. (*Soule, supra*, 8 Cal.4th at p. 567 ["where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect"]; see *Campbell v. General Motors Corp., supra*, 32 Cal.3d at p. 126 ["it is difficult to conceive what testimony an 'expert' could provide"].) However, if a "product at issue is only in specialized use, so that the general public may not be familiar with its safety characteristics," but the product's users have widely shared minimum safety expectations beyond the lay experience common to all jurors, expert testimony may be proper "on the limited subject of what the product's actual consumers *do expect* . . . ." (*Soule*, at pp. 567–568, fn. 4; accord, *McCabe, supra*, 100 Cal.App.4th at p. 1120, fn. 3.) Although the holster design does not pose the kinds of technical questions that may preclude application of the consumer expectation test (see *Soule*, at p. 570 [consumer expectation test inapplicable because plaintiff's "theory of design defect was one of technical and mechanical detail"]), unlike a car or other commonly used products, holsters designed to conceal weapons and the expectations of the product's users—largely those in law enforcement—are simply not within the everyday experience common to all jurors.

Martini's declaration addresses the expectations of law enforcement officers who use concealable holsters, noting the considerations for their use are very different from those for holsters that offer a higher degree of firearm safety: "Plaintiff was trained and familiar with the operation and safety features of the Safariland Triple Retention Holsters which he used for

---

[19] As long as it does not do so arbitrarily, in all but professional negligence cases where the standard of care must be established by expert testimony, a jury may entirely reject the testimony of one party's expert witness even when the other party does not call any opposing expert and the expert testimony is not contradicted. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632–633 [85 Cal.Rptr.2d 386]; *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1568 [90 Cal.Rptr.3d 644] ["the trial court is free to reject testimony of a party's expert, so long as the trier does not do so arbitrarily"].) However, on summary judgment, if the moving party's expert testimony is properly admitted and not controverted by an opposing expert, the court cannot deny the motion because a jury could arguably reject the expert's view. (§ 437c, subd. (e) [if a party is otherwise entitled to summary judgment, the motion "may not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment" except where the only proof of a material fact is the declaration by an individual who was the sole witness to the fact or an individual's state of mind is established solely by that individual's affirmation].)

uniformed (exposed) carry as a result of his training by the Los Angeles Police Department. This design of holster offers a high degree of firearm security with the sacrifice of being a large and bulky holster, complicated retention system (requiring mastering and periodic practice), and a heavy support belt to securely hold the holster in place. The application and design considerations of this type of holster are very different than that of a holster designed for concealability. The Safariland Triple Retention Holsters and similar designs maximize firearm retention (safety) at the sacrifice of weight, bulk, speed, and complexity to limit access from those other than the officer. Due to Plaintiff's training and personal experience, he would have been knowledgeable as to the differences between holster applications such as exposed uniformed exposed carry and concealed carry."

Lord's declaration does not address the conceal ability of the holster and the concomitant considerations or expectations of its users. He merely states, "[H]olster manufacturers (and consumers) would reasonably expect that a holster that is designed for use with a weapon without a manual safety, with a light trigger, half-cocked, and no grip safety *must* be one that strongly prevents access to the trigger guard." As discussed, it is generally enough to submit the question to the jury if the plaintiff provides evidence concerning his or her use of the product, the circumstances surrounding the injury and the objective features of the product relevant to its safety. (See *Campbell v. General Motors Corp., supra*, 32 Cal.3d at p. 127.) But where, as here, the actual consumer is a sophisticated user and evidence has been presented by defendant with a summary judgment motion that such a consumer would not expect the product at issue to perform differently than it did, it is plaintiff's burden to present his or her own expert testimony from which the jury could conclude the product did not perform as expected. "Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of *Barker*." (*Soule, supra*, 8 Cal.4th at p. 568.) Lord did not opine, and Chavez presented no other evidence, a concealable holster user expects it will prevent accidental discharge. Chavez has failed to create a triable issue of fact warranting submission of this theory to the jury.

> e. *Failure to warn and other causes of action*

As discussed in connection with Chavez's failure to warn causes of action against Glock and Revolver Club, these causes of action against Bushnell and Turner's fail because Chavez was a sophisticated user. Chavez's negligent product design causes of action fail for the reasons his strict liability causes of action fail, and his causes of action for breach of implied warranty fail because he does not challenge the trial court's ruling on them (see *Reyes v.*

*Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457] ["[a]l-though our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief"]).

### DISPOSITION

The judgments in favor of Bushnell and Turner's are affirmed. The judgments in favor of Glock and Revolver Club are reversed. On remand the trial court shall enter orders of summary adjudication as to Chavez's causes of action for failure to warn against Glock and Revolver Club and conduct further proceedings not inconsistent with this opinion. Bushnell and Turner's are to recover their costs on appeal. Glock, Revolver Club and Chavez are to bear their own costs on appeal.

Zelon, J., and Jackson, J., concurred.

A petition for a rehearing was denied August 14, 2012, and appellants' petition for review by the Supreme Court was denied October 10, 2012, S205148.