Filed 1/22/21  Nalbandian v. Los Angeles Dodgers CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GREGORY NALBANDIAN, | B302524 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC650508) |
| v. | |
| LOS ANGELES DODGERS LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura A. Seigle, Judge.  Affirmed.

Law Office of Martin Stanley and Martin Louis Stanley for Plaintiff and Appellant.

Jerome M. Jackson for Defendants and Respondents.

————————————————

Plaintiff Gregory Nalbandian appeals from the trial court's grant of summary judgment in favor of defendants and respondents Los Angeles Dodgers LLC, Dodger Tickets LLC, Dodger Tickets Manager Corp., and LA Holdco LLC (collectively, defendants). Plaintiff sued defendants and others for his injuries after being struck by a vehicle while walking across several lanes of traffic on the access road to Dodger Stadium. The trial court ruled that plaintiff failed to establish a triable fact on the issue of causation.

On appeal, plaintiff argues the trial court wrongly rejected the opinions of his expert witness. Alternatively, he argues that the trial court should have allowed him the opportunity to file an amended expert declaration to cure any deficiencies.

We conclude that the description of the purported expert's qualifications in his declaration was too vague to establish expertise in the matters upon which he opined, and the trial court rightly rejected the opinions. Plaintiff did not request an opportunity to amend the declaration in the trial court, thereby forfeiting that argument on appeal. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

On August 19, 2016, plaintiff drove to Dodger Stadium to attend a rock concert. His wife, Brooke Japhet, was in the car with him. The access road leading to the stadium consisted of approximately six lanes allowing entry into the stadium parking lot, and one lane allowing vehicles to exit. When plaintiff and Japhet turned onto the access road, the six entry lanes were filled with vehicles slowly making their way towards the parking lot entrance.

2

As plaintiff and Japhet were waiting in the line of vehicles, Japhet got out of the car and walked across multiple lanes, intending to walk onto the premises to attend the concert. Plaintiff pulled over to the side of the road, turned on the hazard lights, and followed Japhet on foot across the several lanes of vehicles. When plaintiff reached the exit lane, he was struck by a car exiting the premises. A witness to the incident reported that the car had an Uber sticker on its back window.

## PROCEDURAL HISTORY

### 1. Motion for summary judgment and opposition

Plaintiff filed an action against defendants and others. Defendants moved for summary judgment on the second cause of action, premises liability, which was the only cause of action plaintiff asserted against them. Defendants argued they did not breach any duty of care they may have owed to plaintiff, and their actions or inactions were not the proximate cause of plaintiff's injuries.

Defendant's separate statement of undisputed facts was based on the depositions of plaintiff, Japhet, a stadium parking lot cashier, and a police officer who responded after the incident, as well as the declaration of Michelle Darringer, the risk manager for Los Angeles Dodgers LLC. Defendants did not submit any declarations from experts.

Plaintiff opposed the motion, and filed a declaration by William Serantoni, a retired senior superintendent and senior facilities management planner at the University of California Los Angeles (UCLA). Explaining his qualifications, Serantoni declared: "While at UCLA I supervised the electrical department and managed many lighting and power projects that affected

3

traffic and the roadways on the UCLA campus. My duties included project management of street lighting, paving, painting and striping. My job also required me to interact with the campus parking service and the University of California Police Department regarding traffic control for events taking place at the UCLA campus."

Serantoni explained that his opinions were based on a "visit to the incident site" and his "background and experience in facilities management at UCLA." He also reviewed the deposition transcripts of plaintiff and Japhet, including three photographs of the access road attached as exhibits to Japhet's deposition transcript, and the declaration and rough deposition transcript of Darringer.

Serantoni opined that the safety measures at the stadium parking lot and access road "fell below the standard of care used in the industry" because there was no "event staff perform[ing] traffic control" or "slow[ing] down vehicles," vehicle speed was not limited to 10 miles per hour, there were no "traffic control devices such as radar-controlled speed signs that post the driver's speed," and no "lighted message boards [or] signs" warning drivers to slow down and watch for pedestrians. Serantoni also opined that, "[s]ince it was night-time and the sky was dark, it was likely that there was poor visibility of pedestrians crossing the exit lane. The illuminated headlights from the arriving cars waiting in the entry lanes would have likely also contributed to poor visibility of pedestrians crossing the exit lane. Thus the standard of care required . . . bright overhead lighting over the exit lane and pedestrian path . . . ."

According to Serantoni, defendants should have anticipated that Uber and other ride-share drivers would be leaving the

4

venue while other vehicles were arriving, and that people "waiting in jammed traffic would attempt to walk into the venue and would cross the roadway" to reach the "marked pedestrian path" across the exit lane. Defendants also "should have known Uber drivers are not professional taxi or shuttle drivers who obtain special licenses and training to operate commercial vehicles," and therefore "may not be as attentive to pedestrians."

Concluding his declaration, Serantoni stated that defendants' "actions and inactions . . . fell below the industry standard of care," and "more likely than not[ ]contributed to the Uber's collision with [plaintiff] and his injuries in this case because it is likely that the Uber driver, based on the facts, did not have sufficient lighting, visibility or direction by staff in the area."

## 2.     Trial court's ruling

In its ruling, the trial court first addressed whether there was a triable material fact that the incident was foreseeable such that defendants breached a duty to plaintiff by not preventing it. The court concluded that "the design of the road and Plaintiff's location was not such that the risk of harm by a speeding vehicle exiting the stadium was obvious by simple observation."

The trial court also found unconvincing Serantoni's opinion that defendants should have known there would be ride share operators driving in the area, that those drivers would not have special licenses or training, that passengers might exit their vehicles in jammed traffic and cross the roadway, or that the sky was dark and visibility poor. The court stated, "The expert gives no factual basis for his conclusions. He states his conclusions are based on [ ]his experience, but he does not describe pertinent experience. He supervised the electrical department at UCLA

5

and managed street lighting and power projects. It is unclear whether he determined where street lighting should be placed, or managed the workers who installed the lighting, or something else. He says he 'interacted' with campus police about traffic control for events at UCLA. He does not say [ ]he managed the projects from the perspective of safety or traffic control or that he has any expertise, education, or experience in traffic safety, traffic control or crowd management."

The trial court noted that it could "reject an expert's conclusion 'that does not contain "a reasoned explanation illuminating why the facts have convinced the expert" . . . [Citations].' " "Here we have only conclusions about foreseeability from the expert. He does not identify the facts or experience on which he bases his assertions about the practices of Uber drivers, the 'standard practice for commercial venues,' the 'standard of care' required in access roads, and the 'industry standard of care.' "

Despite the trial court's rejection of Serantoni's conclusions, the court found there was a triable issue of material fact concerning foreseeability, because the stadium parking lot cashier had testified that it was very common for people to walk across traffic in that area.

Turning to the issue of causation, the trial court first found that defendants had satisfied their initial burden to demonstrate that plaintiff could not establish causation. The court reached this conclusion based on Japhet's deposition testimony "that the car that hit Plaintiff appeared 'unexpectedly' and that there was nothing that could have been done to stop the accident." The court also cited plaintiff's deposition testimony "that he did 'not believe the Dodgers caused this accident' and that as to his

6

injuries, he did 'not believe the Dodgers had anything to do with it' and that Uber is responsible for its allegedly reckless driver." The court acknowledged, however, that plaintiff had testified "that he believed Dodger Stadium parking lot or the stadium itself had an obligation 'to settle what happened.' "

Having concluded that defendants had met their initial burden, the trial court then found that plaintiff had not met his burden to establish the existence of a triable issue concerning causation. "Apart from the expert's declaration, which lacked foundation for his conclusions, Plaintiff did not submit evidence that the accident could have been avoided with additional safety precautions." "At most, Plaintiff presents speculation that if Defendants had installed additional safety measures such as lights, cross walks, and signs for exiting cars to slow down or had additional security personnel that evening, Plaintiff would not have been hit. But 'proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence. . . . [Citation.]' " Accordingly, the trial court granted defendant's motion for summary judgment.

Two days later, plaintiff filed an objection to the trial court's order. Plaintiff contended that expert declarations submitted in opposition to a motion for summary judgment must be "liberally construed," and the trial court's "view of Mr. Serantoni's declaration was unduly restrictive." Plaintiff requested "a new hearing to allow the court to correct the error," and stated his intention to file "a motion for new trial to correct this error of law." No ruling on plaintiff's motion appears in the appendix provided to us by plaintiff on appeal, nor does a motion

7

for a new trial.  Plaintiff contends the trial court never ruled on his objection.

The trial court entered judgment in favor of defendants, and plaintiff timely appealed.

## STANDARD OF REVIEW

" 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.]  '[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' [Citation.]  A defendant can meet this burden by 'present[ing] evidence which, if uncontradicted, would constitute a preponderance of evidence that an essential element of the plaintiff's case cannot be established.'  [Citation.]  'Once the [defendant] has met that burden, the burden shifts to the [plaintiff] to show that a triable issue of one or more material facts exists as to the cause of action . . . .'  [Citations.]  A triable issue of material fact exists when 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'  [Citation.]"  (*Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 287–288 (*Webster*).)

Our review of an order granting summary judgment is de novo.  (*Webster*, *supra*, 26 Cal.App.5th at p. 288.)  "Courts are split," however, "regarding the proper standard of review for the trial court's evidentiary rulings in connection with motions for summary judgment and summary adjudication."  (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017)

8

14 Cal.App.5th 343, 368 [noting that some courts review for abuse of discretion and some review de novo].) Because we conclude the trial court ruled correctly even under de novo review, we need not decide whether a more lenient standard applies.

## DISCUSSION

Plaintiff raises two challenges on appeal. First, he argues the trial court erred by rejecting the opinions of his expert, Serantoni. Second, he contends the trial court erred by not allowing him to amend Serantoni's declaration to the extent it was deficient. As we explain below, plaintiff's first argument lacks merit, and the second is forfeited. We express no opinion as to any other aspect of the trial court's ruling.

## A.    The Trial Court Correctly Rejected Serantoni's Opinions

The trial court found that Serantoni's opinions lacked a factual basis, largely because he purported to base his opinion on his experience without describing what that experience was. The trial court characterized Serantoni's description of his past work as "unclear" as to what exactly he did, noting that he "does not say [ ]he managed the projects from the perspective of safety or traffic control or that he has any expertise, education, or experience in traffic safety, traffic control or crowd management." Therefore, although the trial court did not so state expressly, in essence it found that Serantoni had failed to establish sufficient expertise in the matters on which he was opining. We agree.

" 'A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact.' " (*Property*

9

*California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1163; see Evid. Code, § 801, subd. (a).) "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).)

There is no requirement that the proffered expert " 'work in a particular field' " (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1319 (*Chavez*)), nor is expertise " 'subject to rigid classification according to formal education or certification' " (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294 (*ABM*)). "Rather, an expert's qualifications can be established in any number of different ways, including 'a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.' " (*ABM*, at p. 294.) "The determinative factor is whether the expert 'has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the [trier of fact] in the search for the truth.' " (*Chavez*, at p. 1319, second bracketed insertion added.) It follows that, if a purported expert lacks such skill and experience, his or her testimony would not assist the finder of fact, and therefore would be inadmissible.

Here, "the subject to which [Serantoni's] testimony relates" (Evid. Code, § 720, subd. (a)) concerned the industry standard of care to which defendants were subject, the safety measures taken (or not taken) on the access road approaching Dodger Stadium, and the training, licensure, and practices of ride-share drivers. The brief, seven-line paragraph in Serantoni's declaration describing his qualifications was insufficient to show he had

10

"special knowledge, skill, experience, training, or education" in these areas. (*Ibid.*)

We note preliminarily that our analysis, like that of the trial court, is based entirely on Serantoni's declaration, the only information we have on his qualifications as an expert. Needless to say, we have no knowledge of the extent of his actual qualifications, and do not intend to disparage them in any way.

Serantoni described himself as a retired "Senior Superintendent and Senior Facilities Management planner" at UCLA. He explained that he "supervised the electrical department and managed many lighting and power projects that affected traffic and the roadways on the UCLA campus." He does not describe the projects or explain the term "affected"— were traffic and roadways the targets of these projects, or merely incidentally affected by them? Either way, did the projects impact traffic safety or control, the matters at issue in the instant case? The declaration is missing this connective tissue.

Serantoni further stated, "My duties included project management of street lighting, paving, painting and striping." His opinions, however, did not concern the physical condition of the access road and whether it was adequately paved, painted, or striped, but rather whether there was sufficient signage and staff controlling traffic.

Serantoni opined that the "standard of care" required "bright overhead lighting." Serantoni did not provide any detail about his experience with street lighting to qualify him as an expert to give an opinion on that standard of care. He nowhere describes of what his "management" of street lighting projects consisted, what sort of lighting he worked with, and whether it was comparable to the lighting at issue in this case.

11

Even assuming arguendo the declaration sufficiently established Serantoni's expertise in street lighting, his opinion in that regard lacked foundation no matter how liberally we construe his declaration. He nowhere indicated that he actually observed the lighting on the access road, or determined that it was insufficient; indeed, he only opined that "it was *likely* that there was poor visibility of pedestrians" because the incident happened at night. There is no indication that he visited the incident site at night to review the lighting conditions, and the photographs he reviewed attached to Japhet's deposition were taken during the day. An " 'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . ." ' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)

The last sentence describing Serantoni's qualifications stated, "My job also required me to interact with the campus parking service and the University of California Police Department regarding traffic control for events taking place at the UCLA campus." Serantoni did not explain of what this interaction consisted, or what his role was in that interaction. Therefore, it is unclear if that interaction provided him with experience in traffic safety and control, and if so, what sort of experience.

We note that none of Serantoni's stated qualifications, even viewed liberally, provided any basis to opine on the training, licensure, and practices of ride-share drivers, one of the subjects of his opinion. Nor is it clear what "industry" he referred to when describing the standard of care, and what his connection is with that industry.

12

In short, Serantoni's declaration was too lacking in detail to establish his qualifications to offer the opinions he provided. At most it arguably established he could opine on street lighting, and as we have explained, that opinion nonetheless fails for lack of factual support.

Plaintiff argues the trial court wrongly focused on Serantoni's "lack of formal credentials" and his "level of seniority and licensing" in rejecting his opinions. Plaintiff contends that a person may qualify as an expert "based on experience and association with others in the field that is the subject of the testimony." We have no quarrel with that proposition, but we disagree that the trial court rejected Serantoni's opinions because of his lack of formal credentials, seniority, or licensing. The trial court instead noted that Serantoni purported to base his opinions on "experience" without explaining what that experience was. As we have explained, we agree with the trial court's assessment.

Plaintiff cites authority concerning the qualification of experts, but the extent of the qualifications described in that authority merely emphasizes the lack of equivalent detail in Serantoni's declaration.[1]

---

[1] In support of the proposition that "courts have admitted expert testimony based on experience and association with others in the field that is the subject of the testimony," plaintiff cites *Smith v. Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 783 and *New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 692. The experts' qualifications were not at issue in those cases; rather, the issue was whether the matters on which they testified required expert testimony. (See *Smith*, at p. 783; *New*, at p. 692.) Those cases are not instructive on the issues before us.

*Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320 (*Jennifer C.*) concerned a suit for negligent supervision and maintaining a dangerous condition of public property brought by a special-needs high school student after another special-needs student sexually assaulted her on the school campus. (*Id.* at p. 1324.) In opposing summary judgment, the plaintiff proffered an expert who stated that he had " 'personally consulted with more than 80 school districts in 12 states involving issues concerning both general and special education students, school curriculum, school safety, school supervision and related topics. I have conducted investigations of school incidents and have analyzed more than 150 cases in the past fifteen years involving issues of school supervision and dangerous conditions on school properties, including cases involving claims of inappropriate sexual or physical contact between students, or students and school personnel. I have personally qualified as an expert in school safety issues on more than 30 occasions in Courts within California alone.' " (*Id.* at p. 1332, italics omitted.)

The trial court excluded the expert's opinions, in part because he " 'd[id] not demonstrate any qualifications to give an expert opinion on issues of special education.' " (*Jennifer C.*, *supra*, 168 Cal.App.4th at p. 1331.) The Court of Appeal held this was an abuse of discretion. (*Id.* at p. 1332.) The appellate court "doubt[ed] that there is any school safety expert who devotes himself or herself to the subcategory of special education school safety," but noted that the expert had stated, inter alia, that he had consulted with many schools on "issues concerning both general and special education students." (*Ibid.*, italics omitted.) The appellate court further noted that, "[w]hile not

14

determinative, we also observe that the trial court's ruling may be at variance with the rulings of 30 other trial court rulings concerning [the expert's] expertise." (*Ibid.*) The appellate court described the trial court's view of the expert's declaration as "very narrow and stingy." (*Ibid.*)

*ABM* concerned expertise in "database management and analysis" in a wage-and-hour class action. (*ABM, supra,* 19 Cal.App.5th at pp. 283, 294.) The proffered expert stated, inter alia, that he had founded a company that developed billing databases for major telecommunications companies, that he was managing partner of another company that created billing and database mechanisms for banks and provided database management services databases for government and private industries, and that a " 'typical transaction load' for an 'average database' maintained by his company was approximately one million records a day." (*Id.* at p. 295.) The expert also had " 'extensive experience in creating, managing, and analyzing large databases,' including specifically timekeeping databases," and had "provided 'payroll and timekeeping database analysis for attorneys in Northern and Southern California involving numerous wage and hour class action cases.' " (*Ibid.*)

The trial court found the expert unqualified for lack of " 'evidence that he holds certificates, has obtained any kind of college or other professional degree, belongs to any professional organizations, has published any articles, taught or has ever testified as an expert witness at trial.' " (*ABM, supra,* 19 Cal.App.5th at pp. 293–294.) The Court of Appeal held this was error: "In particular, we find that the trial court's emphasis on formal education and membership in professional organizations was misplaced with respect to [the expert's]

15

stated expertise, given his clear familiarity with numerous, highly complex transactions in [database management and analysis]." (*Id.* at pp. 296–297.)

In *Chavez*, a police officer was injured when his three-year-old son accidentally discharged the officer's service weapon. (*Chavez, supra,* 207 Cal.App.4th at p. 1290.) The officer sued the manufacturers and retailers of the weapon and holster, claiming those items lacked sufficient safety features. (*Ibid.*)

In opposing summary judgment, the officer filed a declaration from a " 'legal consultant/expert on firearms and firearms safety, ballistics, protective equipment, and testing issues.' " (*Chavez, supra,* 207 Cal.App.4th at p. 1297.) The expert's declaration stated that he "ha[d] more than 30 years of experience as a design engineer 'involved in all aspects of mechanical engineering design and analysis of firearms, other weapons systems and related equipment' and 'as a Gunsmith, proficient in the design, manufacture, repair and restoration of a wide variety of handguns, rifles and shotguns.' He ha[d] 'performed ballistics and terminal effects experiments and developed several innovative special purpose small arms projectile and weapons subsystems.' His areas of expertise include[d] 'testing and evaluation of firearms, firearm design assessment, design optimization, product development, ammunition, body armor and other law enforcement equipment . . . . .' Additionally, he ha[d] worked with various law enforcement and correction agencies, including the National Institute of Science and Technology—Office of Law Enforcement Standards, for which he reviewed and revised 'national law enforcement equipment standards . . . .' " (*Id.* at p. 1329, fn. 17.)

16

The trial court found the expert "was not qualified to testify concerning holsters and thus disregarded his opinions on those points." (*Chavez*, *supra*, 207 Cal.App.4th at p. 1300.) The Court of Appeal held it was an abuse of discretion to exclude the expert's opinion that "the gun was in the holster when it was discharged," given the expert's "broad" "experience and expertise in the field of firearms and ballistics."[2] (*Chavez*, at p. 1319.) "With respect to performing tests specifically to determine whether the gun was in the holster when it was fired, [the expert] stated, 'I have performed forensic reconstruction work of this nature over the course of my career in firearm design, repair, accident reconstruction, National Standard Development and Medical Legal Death Investigation.'" (*Id.* at pp. 1319–1320.) The expert's "education, experience and training clearly qualified him for and encompassed" testing whether a gun was in the holster when fired. (*Id.* at p. 1320.)

*Martinez v. Costco Wholesale Corp.* (C.D.Cal., Sept. 19, 2019, No. SACV 18-1296 JVS (KESX)) 2019 U.S. Dist. Lexis 212482) (*Martinez*), a federal case, concerned a motion for summary judgment in an action arising from a fatal vehicle-pedestrian collision in defendant's parking lot. (*Id.* at pp. *1–*4.) Defendant challenged the qualifications of plaintiff's expert, a civil engineer, arguing that the expert "has no experience designing parking lots and is therefore unqualified to comment upon the design of [defendant's] parking lot . . . ." (*Id.* at pp. *8–*9.)

---

[2] The appellate court found it unnecessary to address whether the expert was qualified to opine on holster design. (*Chavez*, *supra*, 207 Cal.App.4th at p. 1320.)

The district court rejected this challenge, noting that "[t]he burden to establish expertise is not as onerous as [defendant] advocates.  Rather, the admissibility hurdle for qualifications is relatively low, and it requires a 'minimal foundation' of knowledge, skill, and experience." (*Martinez*, *supra*, 2019 U.S. Dist. Lexis 212482 at p. *9, quoting *Hangarter v. Provident Life & Acc. Ins. Co.* (9th Cir. 2004) 373 F.3d 998, 1016.)[3]  The expert at issue had a bachelor's degree in civil engineering, had "conducted investigations and analyzed more than 11,000 accident cases in the past 28 years, including dozens of parking lot accidents with vehicles and pedestrians," and had "been qualified as a safety engineer and accident reconstruction expert on hundreds of cases." (*Martinez*, at p. *9.)  He stated in deposition that he had done many condition assessments and safety audits of properties, including parking lots, and made recommendations for improving parking lot safety and compliance with the Americans with Disabilities Act.  (*Id.* at pp. *9–*10.)  The district court found that the expert was qualified, "based on his experience analyzing accidents, assessing properties, and conducting safety audits." (*Id.* at p. *10.)  "That he may not have experience designing parking lots goes to the weight of his opinion." (*Ibid.*)

Serantoni's qualifications as described in his declaration are not comparable with the qualifications of the experts in *Jennifer C.*, *ABM*, *Chavez*, and *Martinez*.  The experts in those

---

[3] *Martinez* applied federal law on the question of expert qualifications.  (See *Martinez*, *supra*, 2019 U.S. Dist. Lexis 212482 at p. *9.)  We will assume for purposes of argument only that federal law and state law do not materially differ on this issue.

cases all described experience directly applicable to the issues on which they were opining.  In *Jennifer C.*, a case about school safety and negligent supervision of a special-needs student, the expert had " 'personally consulted' " with dozens of school districts on issues concerning "special education students," "school safety," and "school supervision." (*Jennifer C.*, *supra*, 168 Cal.App.4th at p. 1332.)  In *ABM*, a wage-and-hour case, the expert had " 'extensive experience in creating, managing, and analyzing large databases,' including specifically timekeeping databases," and had "provided 'payroll and timekeeping database analysis for attorneys . . . involving numerous wage and hour class action cases.' " (*ABM*, *supra*, 19 Cal.App.5th at p. 295.)  In *Chavez*, a case concerning firearm and holster safety, the expert "ha[d] more than 30 years of experience as a design engineer 'involved in all aspects of mechanical engineering design and analysis of firearms, other weapons systems and related equipment' . . . ." (*Chavez*, *supra*, 207 Cal.App.4th at p. 1319, fn. 17.)  In *Martinez*, a case about a vehicle-pedestrian collision in a parking lot, the expert had "conducted investigations and analyzed more than 11,000 accident cases in the past 28 years, including dozens of parking lot accidents with vehicles and pedestrians," and had "been qualified as a safety engineer and accident reconstruction expert on hundreds of cases." (*Martinez*, *supra*, 2019 U.S. Dist. Lexis 212482 at p. *9.)[4]

Serantoni's declaration, in contrast, did not indicate any experience in traffic safety, traffic control, or the licensure, training, and practices of ride-share drivers.  Statements that he

_____

[4] In quoting these excerpts, we do not intend to suggest that the quoted language alone would be sufficient to qualify someone as an expert, a question we need not decide.

19

"managed lighting and power projects that affected traffic and the roadways at UCLA campus" and "interact[ed] with the campus parking service and the University of California Police Department regarding traffic control," as we have explained, are too vague for either the trial court or this court to infer that Serantoni developed expertise from those experiences in the matters on which he was opining.

Plaintiff argues that courts must apply a more lenient standard to expert opinions submitted in opposition to motions for summary judgment. He cites *Jennifer C.*, which held that expert declarations submitted in opposition to summary judgment motions are "to be liberally construed," and do not require the "detailed, reasoned explanation" required of expert declarations offered in support of summary judgment motions. (*Jennifer C., supra*, 168 Cal.App.4th at p. 1332; accord, *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189 (*Garrett*).)[5]

*Jennifer C.* and *Garrett* applied a rule of liberal construction when assessing the reasoning behind the experts' opinions. (*Jennifer C., supra*, 168 Cal.App.4th at p. 1333 ["Applying a liberal construction to [the expert's] declaration and resolving any doubts in appellant's favor, we conclude that his opinions were adequately supported by a reasoned explanation and were not 'conclusory.' "]; *Garrett, supra*, 214 Cal.App.4th at p.

---

[5] Plaintiff claims that *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 "suggest[s] that trial courts are to apply leniency and deference to an expert testifying in opposition to a motion for summary judgement." *Reid* does not in fact address that topic at all, or anything concerning how trial courts are to evaluate expert testimony.

189 ["Liberally construing the [expert] declaration, we conclude that the explanation provided for [the expert's] opinion was sufficient and that the trial court could not properly exclude the expert testimony based on [the expert's] failure to identify the particular tests employed or describe the test results."].) In neither case, however, did the appellate court invoke a rule of liberal construction when making the initial determination whether the expert was qualified, nor do the facts of those cases suggest the courts applied a more lenient standard on that question. As discussed above, the *Jennifer C.* court held that, inter alia, the expert's stated experience in consulting on special education issues and his prior qualification as an expert in 30 cases adequately established his experience. (*Jennifer C.*, at p. 1332.) Similarly, in *Garrett* the Court of Appeal deemed a " 'metallurgist with more than 30 years of experience in materials analysis, failure analysis and material trade-off evaluation' " qualified to opine on the "nature and hardness of the materials" use in the prosthesis at issue in the case. (*Garrett*, at p. 190.)

Here, in contrast, the terse description of Serantoni's experience in his declaration did not demonstrate he was qualified to opine on the multiple topics in that declaration. As we have explained, expert opinion untethered to qualification to render those opinions is inadmissible evidence. Accordingly, we need not reach the question whether, liberally construed, Serantoni's opinions would have established a triable issue had they been provided by a qualified expert. The trial court thus properly rejected Serantoni's opinions in granting summary judgment.

Plaintiff argues the trial court applied too strict a standard for causation when assessing Serantoni's opinions. Because

21

Serantoni's declaration did not satisfy the threshold of establishing his expertise, we need not decide whether the trial court applied the correct standard for causation in evaluating whether his opinions established a triable issue.

**B.      Plaintiff Forfeited His Argument That the Trial Court Should Have Permitted Amendment of Serantoni's Declaration**

Plaintiff argues that to the extent Serantoni's declaration was lacking, "it was not incurably deficient and Plaintiff should have been given the opportunity to amend it to address the court's concerns prior to the dismissal of his case." Plaintiff never requested the trial court grant an opportunity to submit an amended declaration, however, thereby forfeiting this argument. (*Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal.' "].)

As defendants note, they filed written objections to Serantoni's declaration, including to his qualifications, a week in advance of the hearing on the motion for summary judgment. The record does not indicate that plaintiff filed anything to address those objections, or that he requested an opportunity to do so.

Two days after the trial court granted summary judgment, plaintiff filed a written objection to the order, raising what is now the first argument in this appeal, that is, that the trial court failed to apply the more lenient standard for expert declarations in opposition to summary judgment articulated in *Jennifer C.* and elsewhere. In other words, plaintiff contended that the trial court should have accepted Serantoni's declaration as written. Plaintiff requested "a new hearing to allow the court to correct

the error." Plaintiff did not, however, suggest as an alternative that he file an amended expert declaration addressing the trial court's concerns, or request from the trial court the opportunity to do so. He thus forfeited this argument on appeal.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


BENDIX, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.